# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**MIKA LOUISE TOWNSEND,**

               **Plaintiff,**

**-vs-**                                       **Case No.  6:13-cv-1783-Orl-DAB**

**COMMISSIONER OF SOCIAL
SECURITY,**

               **Defendant.**

_____

# Memorandum Opinion & Order

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) finding her disability had ceased as of June 10, 2010 and curtailing her Supplemental Security Income (SSI) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case. Oral argument has not been requested.

For the reasons that follow, the decision of the Commissioner is **REVERSED** and **REMANDED.**

## I.      BACKGROUND

### A.    Procedural History

On October 22, 2002, the Commissioner found Plaintiff disabled as of April 1, 2002 and awarded her Supplemental Security Income benefits. R. 13, 64. In 2010, the state agency conducted

a continuing disability review and concluded Plaintiff was no longer disabled as of June 10, 2010.

R. 63-68, 80-92. Plaintiff challenged that decision and, on appeal, a hearing was held on June 7, 2012,

before Administrative Law Judge Curt Marceille (hereinafter referred to as "ALJ").  R. 36.  In a

decision dated June 14, 2012, the ALJ found Plaintiff's disability had ended on June 10, 2010.  R.10-

29.  Plaintiff timely filed a Request for Review of the ALJ's decision, which the Appeals Council

denied on April 3, 2012.  R. 1.  Plaintiff filed this action for judicial review on November 14, 2013.

Doc. No. 1.

### B.    Medical History and Findings Summary

On June 10, 2010, the date the ALJ found her disability had ceased, Plaintiff was forty-two

years old. R. 47.  She has a high school education and no history of past relevant work.  R. 42, 439.

As the ALJ noted, the Commissioner originally found Plaintiff disabled in 2002 based upon

marked limitations caused by her anxiety/panic disorder. R. 16.  The ALJ found that, as of June 10,

2010, Plaintiff's suffered from the impairments of mood disorder, not otherwise specified;

degenerative disc disease; degenerative joint disease of the right shoulder; history of Morton's

neuroma on foot; esophagitis; gastritis; and hemorrhoids, which were severed, but were not severe

enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P,

Regulations No. 4.  R. 15.  The ALJ further found that medical improvement occurred as of June 10,

2010.  R. 17.  Specifically, while marked limitations caused by an anxiety/panic disorder previously

caused Plaintiff's disability, the ALJ found that her present mental residual functional capacity (RFC)

allowed her to perform simple, repetitive, and routine tasks, with no more than occasional changes

in the work setting and interactions with coworkers, supervisors, and the public. R. 17.  The ALJ

found that Plaintiff's physical RFC as of June 10, 2010 enabled her to perform light-level work with

no more than occasional stooping, crouching, balancing, kneeling, and overhead reaching with the

right shoulder; no concentrated exposure to pulmonary irritants; and no climbing of stairs, ramps,

ladders, ropes, or scaffolds.  R. 18.  Considering Plaintiff's vocational profile and RFC, the ALJ

applied the Medical-Vocational Guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, and, based

on the testimony of the vocational expert ("VE"), the ALJ concluded that Plaintiff could perform work

existing in significant numbers in the national economy as cleaner/housekeeper, agricultural produce

sorter, and officer helper at the light level; and escort vehicle driver, ticket checker, and surveillance

system monitor at the sedentary level.  R. 27-28.  Accordingly, the ALJ determined that Plaintiff's

disability ceased as of June 10, 2010.  R. 29.

Plaintiff now asserts two points of error.  First, she argues that the ALJ erred in considering

Plaintiff's credibility and in wrongly assuming Plaintiff did not seek treatment for nearly seven years

despite evidence to the contrary.  Second, Plaintiff contends the ALJ erred by failing to give the

opinions of her treating physician's proper weight and determining an RFC which was not based on

substantial evidence.   For the reasons explained below, the decision of the Commissioner is

**REVERSED** and **REMANDED**.

## II.      STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct

legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings

are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The

Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C.

§ 405(g).  Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely

create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable

person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th

Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*,

402 U.S. 389, 401 (1971)).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004). "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

If the claimant is entitled to disability benefits, the Commissioner is required to conduct a periodic review to determine whether those benefits should continue. *See* 20 C.F.R. § 404.1594(a). If there has been medical improvement related to the claimant's ability to work, the benefits cease. *Id.* Medical improvement is defined as "any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). A decrease in severity determination must be based on improvements in the claimant's symptoms, signs or laboratory findings. *Id.*

Although the ALJ generally follows five steps in evaluating a claim of disability, *see* 20 C.F.R. §§ 404.1520, 416.920, if the issue is "medical improvement" and cessation of disability benefits, the ALJ must follow additional steps. 20 C.F.R. § 416.994. The Social Security regulations provide an eight-step sequential evaluation process for determining if a claimant's disability continues. *See* 20 C.F.R. § 404.1594(f). First, the claimant must not be engaged in "substantial gainful activity." Second, it must be determined whether the claimant's severe impairment meets or equals the severity of a listed impairment. If the claimant's condition meets or equals the level of severity of a listed impairment, the claimant's disability continues.

If the severe impairment does not equal or meet the severity of a listed impairment, the examiner proceeds to the third step, namely, an assessment of whether there has been medical improvement of the claimant's condition.  Fourth, if there has been medical improvement, it must be determined if that improvement is related to the ability to do work.

If there has not been medical improvement, the examiner proceeds to the fifth step to determine whether any exceptions listed in 20 C.F.R. § 404.1594(d) and (e) apply. Sixth, if there has been medical improvement, it must be determined whether the claimant has a severe impairment or combination of impairments.  If the severe impairment does not equal or meet the severity of a listed impairment, the examiner proceeds to the seventh step, an assessment of the claimant's residual functional capacity; the assessment measures whether a claimant can perform past relevant work despite her impairment. If the claimant is unable to do past relevant work, the examiner proceeds to the eighth and final step of the evaluation process to determine whether, in light of her RFC, age, education and work experience, the claimant can perform other work. § 20 C.F.R. 404.1594(f)(1)-(8).

## III.    ISSUES AND ANALYSIS

### A.    Missing records

Plaintiff contends  the ALJ erred in considering Plaintiff's credibility and wrongly assuming she did not seek any medical treatment for nearly seven years, from 2002 through 2009, when the full set of records from Dr. Mathur's office[1] were not requested by SSA or made part of the Administrative Record, even though Plaintiff had informed the SSA she had been treated by Dr. Mathur since 2004.

---

[1]Apparently, there are two Dr. Mathurs, Rameshwar and Uma Mathur, a married couple, who are both family practice physicians, and who both saw Plaintiff over a period of several years. R. 520.  Neither Plaintiff nor the Commissioner particularly distinguish the opinions of one Dr. Mathur from the other and, since they both treated Plaintiff as part of their joint medical practice, the Court will refer to them collectively as Dr. Mathur.

The Commissioner contends that substantial evidence supports the ALJ's finding of medical improvement, and his RFC finding for the period beginning June 10, 2010, because the ALJ was not required to defer to Plaintiff's subjective complaints or adopt the opinion of (either) Dr. Mathur and Plaintiff failed to prove that her subject complaints were fully credible.  The Commissioner argues, "as part of her burden of proving she is disabled, Plaintiff must establish, through objective evidence, that her subjective complaints are credible. See 20 C.F.R. § 416.1512(a)."

As an initial matter, the Commissioner's description, which appears to shift the burden to Plaintiff to show she remains disabled, is erroneous.  When considering a case for termination or cessation of benefits, as occurred here, the burden is on *the Commissioner* to prove that the claimant is no longer disabled as of the cessation date because the Plaintiff had experienced "medical improvement." *See Simpson v. Schweiker*, 691 F.2d 966, 969 (11th Cir. 1982) (in disability benefits cases involving cessation of a disability, "medical improvement standard" places burden on government to prove, in all relevant respects, that the claimant is no longer disabled as of cessation date), *superceded by statute on other grounds as stated in Elam v. Railroad Retirement Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991); *Huie v. Bowen*, 788 F.2d 698 (11th Cir.1986) (benefits could not be terminated until medical improvement was shown); *Carbonell v. Commissioner of Social Sec.*, 2012 WL 1946070, *3-4  (M.D.Fla. 2012).

Plaintiff contends that the ALJ mistakenly assumed she failed to obtain any medical treatment from 2002 through 2009 since there were no treatment records in the Administrative Record for those dates, even though she informed the SSA twice that she had started treatment with Dr. Mathur in 2004.  Plaintiff testified that her impairments included bipolar disorder, attention deficit disorder, panic, anxiety, schizophrenia, agoraphobic tendencies, and pain issues from "head to toe." R. 40.  She

testified that she continues to have daily panic attacks; she did psychotherapy[2] and she was placed on

"every single anti-depressant" offered and they did not work, until she was put on Seroquel, which

did work. R. 40. She does not sleep, hardly eats, has night terrors, nightmares, and uncontrollable

shaking. R. 40. She has trouble getting to her therapy due to transportation issues. She can drive but

would not because if she is anxious, she is dangerous; she cannot ride the bus or in a closed car with

strangers. R. 41. She was no longer getting the medication samples from Dr. Mathur, and although

he recommended she go to Circles of Care for mental health treatment, she could not get a ride to get

there. R. 41-42. Plaintiff explained that she was prescribed anti-psychotics such as Clonazepam,

Xanax, and Seroquel (R. 43) but the ALJ pressed her on why she had not received any mental health

treatment besides prescriptions from Dr. Mathur; she explained that she became anxious and would

end up leaving. R. 43.

The ALJ found in Plaintiff's case that "medical improvement" had occurred as of June 10,

2010. R. 17. He determined that the medical evidence supported a finding that, as of June 10, 2010,

there had been a decrease in medical severity of the impairment present at the time of the comparison

point decision ("CPD"), primarily because there was a lack of treatment records. R. 17. The ALJ

states that he does not have available the "formal, function-by-function" RFC prepared at the time of

the CPD and instead uses the "disability hearing officer's formulation of what the RFC must have

been at the time of the CPD." R. 15. He cites the transmittal (R. 64) which contained the "basis

code" of A63 for anxiety related disorder, however, the transmittal form completed by Dr. Eeltink

referred specifically to the Psychiatric Review Technique form she completed dated October 2002

(R. 310-26) and it *does* contain the *mental* RFC as completed by Dr. Eeltink. R. 324-25. In the

---

[2]The ALJ misrepresents Plaintiff's testimony in his decision as stating that "she received psychotherapy from 2002 through 2009" (R. 21) – as additional support for discounting her credibility – when she actually testified that she "did psychotherapy" as one treatment for her mental health problems, but did not give a time period. R. 40. The Devereux Program records indicate, as of August 2002, she was going to counseling sessions twice a month. R. 297.

Mental RFC, Dr. Eeltink, the state agency reviewing psychologist, opined Plaintiff was markedly limited in the ability to maintain attention and concentration for extended periods, and to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and in the ability to complete a normal work day and work week without interruptions from psychologically based symptoms. R. 324-25. Her written comments noted Plaintiff's treatment for anxiety, her statements that she will not get on a bus, a psychiatric evaluation which described her as hyperactive, irritable, flighty, anxious, impulsive, restless, and agitated, which was very similar to Dr. McClure's MSE; and reports that her father takes care of everything; she only goes out with a companion and she tends to stay in her room. R. 326. The ALJ fails to discuss, no less discuss or apply, any of Dr. Eeltink's limitations as stated in the Mental RFC. R. 324-25. Most importantly, in determining whether Plaintiff had shown "medical improvement" or whether there was "any decrease in the medical severity of her impairments," the ALJ failed to utilize or consider Plaintiff's Mental RFC from the CPD.

Records from 2001-2002 (at the CPD) indicate Plaintiff was receiving treatment from the Devereux Treatment Network Outpaitent Program at 34 years of age; her two children (ages 13 and 11) lived with her ex-husband; and she had been in foster care as a child from age 11 after living with aunts, uncles, and grandparents; she "had been abused, neglected and abandoned as a child." R. 281, 328[3], 333. Her anxiety began as a pre-teen and began to escalate after she was in an automobile accident in 1989. R. 333-34. She experienced excessive perspiration and difficulty breathing; the episodes occurred daily and generally several times per day, lasting between 10 minutes and two hours. R. 334. The physicians at Devereux Program diagnosed her as suffering from anxiety, panic attacks, mood swings, irritability, fearfulness, obsessions and compulsions, as well as gerophobia, and she had been prescribed antidepressants, mood stabilizers, thought stabilizers, minor tranquilizers,

---

[3]The page is partially obscured (or folded over) and not fully visible. R. 328.

anti-psychotics, etc.  R. 328.  The consultative examiner, Dr. MacKay, opined Plaintiff's ability to

consistently interact with co-workers and supervisors over an extended period of time and her ability

to deal with the stress of the work like situations appeared to be markedly impaired.  R. 335.   The

ALJ did not discuss any of the mental health evidence from the CPD time period of 2001-2002 (R.

15-16[4]), but instead focused *exclusively* on the lack of mental health treatment records from 2002 to

2009.   Under the SSA regulations, to determine whether Plaintiff had experienced medical

improvement – *i.e.,* a decrease in the medical severity of a claimant's impairment since the CPD – the

ALJ was required to compare the Plaintiff's symptoms and medical findings from the CPD to the

periodic review date (June 2010).  The ALJ's failure to consider  Dr. Eeltink's Mental RFC from 2002

and the relevant medical records she reviewed was error, thus, the ALJ's "medical improvement"

findings are not based on substantial evidence.

The ALJ based his finding of "medical improvement," not on a comparison of 2002 mental

health records to those of 2010, but exclusively on the lack of *mental health* treatment records,

finding:

> Despite being awarded disability on the basis of anxiety-related disorders, the claimant
> has received no treatment from a mental health specialist since that time. (See, e.g.,
> Ex. 20F at 3.)  *What little treatment the claimant did receive did not commence before*
> *2009 and since that time has been limited to medication refills from her primary care*
> *provider.* (Exs. 14F; 25F; 30F.) Importantly, during the course of this treatment, the
> claimant did complain of anxiety, but did not allege specific panic attacks of any
> frequency. (Id.)

> As of June 10, 2010, the impairment present at the time of the CPD had decreased in
> medical severity to the point where the claimant had the residual functional capacity
> to perform simple repetitive and routine tasks with no more than occasional changes
> in the work setting and no more than occasional interactions with coworkers,
> supervisors, and the general public.

---

[4]The ALJ found as of June 2010, Plaintiff had mild restrictions in activities of daily living; moderate difficulties in
maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no extended
episodes of decompensation.  R. 16.

In making this residual functional capacity assessment, I did not consider the limiting effects of the impairments that developed after the CPD. That is, this residual functional capacity is based solely on the effects of the claimant's anxiety-related disorder, the singular disabling impairment found at the time of the CPD. (Ex. 1A.) The above residual functional capacity consists of the psychological non-exertional limitations found to persist in light of the entirety of the claimant's impairments. The rationale for this portion of the current residual functional capacity, along with the additional postural, manipulative, and environmental limitations occasioned by the claimant's other physical impairments, is given below.

* * *

The claimant was previously found disabled in October 2002 (with an established onset date of April of that year) primarily on the basis of reported panic attacks. The claimant appears to have begun treatment for panic attacks in June 2001. (Ex. 5F at 3.) This continued through the summer of 2002. (Exs. 6F; 7F; 8F at 2.) *After that point, coinciding with her award of disability benefits, there is no record of any treatment of any kind until April 2009.* (Ex. 12F at 2.) Moreover, the claimant's mental health treatment since that time has consisted only of medications from her primary care provider. The claimant has not sought treatment from a mental health specialist after her award of disability.

* * *

Thereafter, the claimant's treatment was limited to approximately monthly visits with Uma Mathur, M.D., the claimant's primary care provider. (Exs. 14F; 25F; 30F.) As noted, *these visits only began in the summer of 2009, a nearly seven-year gap* in treatment since the claimant was first awarded disability. (Ex. 14F at 2.) Clinic notes reveal that these visits were principally follow-ups and treatment took the form of medication management. In May 2010, she reported "doing well." (Ex. 25F at 8.) In November 2009, the claimant was noted to be "anxious appearing," but I note that these notes record no complaints or findings of daily panic attacks, as the claimant has alleged. (Id. at 14.)

R. 17, 22, 24 (emphasis added).

The Commissioner argues, consistent with the ALJ's finding, that Plaintiff's limited treatment history for her mental health condition after 2002 is inconsistent with her claim of continuing disability. The Commissioner appears to misplace the burden on Plaintiff to show her disability is continuing rather than on the Commissioner to show she has medically improved. The Commissioner cites the ALJ's finding that, coinciding with her award of disability benefits, Plaintiff discontinued treatment with a mental health specialist in 2002. R. 22, 284, 434, 436, 439. The Commissioner argues that the ALJ did consider Plaintiff's explanations for the lapse in mental health treatment —her anxiety and lack of transportation — but found them less than credible, noting that neither anxiety nor

-10-

lack of transportation prevented Plaintiff from receiving medical treatment for her physical impairments from several sources. R. 24, 41-43, 46.  The ALJ found:

> Most injurious to the claimant's credibility is obviously her seven-year gap of all medical treatment, beginning shortly after her initial award of disability. The claimant's rejoinders that she lacked transportation and was too anxious to go to physicians is unavailing in light of the fact that once her benefits were suspended, the claimant was able to attend new rounds of treatment. *Most striking of all, although the claimant's disability eligibility was predicated on anxiety related disorders, she has received no mental health treatment since 2002,* even as she began other treatment in attempt to substantiate her continuing disability. Finally, treatment received since 2009 has been almost exclusively for medication refills. (Exs. 14F; 25F; 30F.)

R. 24 (emphasis added).  The Commissioner also points to the ALJ's determination that Plaintiff was eligible for Medicaid during the period she received benefits, so treatment was available to her, and the primary care physicians' treatment records, dating back to 2009, did not support a finding of disabling mental limitations.  R. 17, 21-22, 397-410, 474-519, 554-61, 566-78.  The Commissioner argues that the ALJ's finding that Dr. Mathur prescribed medication and did not record that Plaintiff experienced debilitating "panic attacks" is supported by substantial evidence.  R. 17, 41-43, 397-410, 474-19, 554-61, 566-78.

The Commissioner does not dispute that there was a lack of records between 2002 to 2009, or that the omission of these records could be precisely because the SSA (ODAR) had not requested them, but argues instead that such an argument is "speculative because the record does not reflect the dates of Dr. Mathur's treatment records the agency requested."  It is clearly the Commissioner's obligation, under the unusual circumstances of this case involving a claimant *already determined to be disabled with panic attacks and anxiety*, to carefully and conscientiously obtain Plaintiff's records, particularly in this case, where Plaintiff has repeatedly stated that she has received treatment during the time period at issue and the lack of records is the basis for finding she has "medically improved." "Once evidence has been presented which supports a finding that a given condition exists it is presumed in absence of proof to the contrary that the condition has remained unchanged." *Simpson*,

691 F.2d at 969 (citing *Rivas v. Weinberger*, 475 F.2d 255, 258 (5th Cir. 1973)).  The Commissioner cannot create "proof to the contrary" simply by failing to conscientiously obtain the records from Plaintiff's treating sources particularly where Plaintiff had testified that she had trouble with Dr. Mathur's office not responding to SSA's request for records.  Plaintiff testified at the hearing:  "[M]y life was ruined almost a year, two years ago, in August due to Dr. Mathur not sending my file.  When I got upset, and I hit the counter, the lady went into a stack of papers and she found the request for Social Security to see my file in March of 2010, I think."  R. 41.

The Commissioner puts inordinate weight on counsel's affirmative response to the ALJ's question regarding whether counsel's brief and updated (early 2012) treatment records "completed the record," in that counsel also made a point of stating just a moment before that Plaintiff's "family doctor [has] *been treating her for the last . . . 10 years*."  R. 39 (emphasis added).  The Commissioner argues that, while the ALJ has a duty to develop a full and fair record, "this does not absolve Plaintiff of the burden of proving her claim and producing evidence to support it."  The Commissioner persists in placing the burden on Plaintiff and misapplying the standard used in cessation cases.

Plaintiff indicated repeatedly on SSA forms that she had been treated by Dr. Mathur from 2004 through the time she was completing the forms (2011 or  2012).  R. 195, 213.  She also consistently indicated that Dr. Mathur prescribed all of her medications, thirteen in total by May 2012, including those for mood disorder (Clonapin), anxiety (Xanax), schizophrenia (Seroquel), and migraines (Immitrex).  R.  214; *see also* R. 195-96, 209 ("primary care physician" prescribing same).  On SSA forms filled out in spring 2011 (but undated by SSA employee V. Martin  R. 206), Plaintiff indicated that she had first seen Dr. Mathur in 2004 and that the date of her most recent visit (prior to completing the form) was on February 2011.  R. 208.  Plaintiff also indicated that she could no longer do her breathing treatments because she had "lost her Medicaid" as of January 2011.  R. 207.

Although Plaintiff authorized her physicians to disclose any and all of her medical records to the Social Security Administration on January 12, 2010 (R. 162) without any limitation on the date of the records, it appears that Dr. Mathur's office did not submit to SSA the full set of Plaintiff's treatment records going back to 2004, when Dr. Mathur began treating Plaintiff.  Dr. Uma Mathur's letter submitted to the SSA, dated July 22, 2010, states:

> This letter is in regards to Mika Townsend-Maloy, Ms. Townsend-Maloy *has been a patient of mine for many years.* Her past medical history includes: Hypercholestemia, GERD, COPD, Heart Palpitations, Chronic Schizophrenia, Mood Disorder, Adult ADHD, Degenerative Joint Disease of right shoulder with an extensive slap tear and supraspinatus and infraspinatus tendinosis, Degenerative Disc Disease at C5 and C6 with anterior and posterior spondylosis, Degenerative Disc Disease of thoracic spine at multiple levels, and mild degenerative grade 1 anterior spondylosthesis with mild posterior bulging annulus. at LS- S1.  Her previous surgeries include; Tubaligation in 1991, Appendectomy in 1986, Bilateral Carpal Tunnel repair, and Neuroma removal left foot in September 2009. *At this time she has had no improvement in the above mentioned conditions and I feel that she is currently unable to work.* I will be forwarding the records requested by Social Security within this week.  If I can be of any further assistance, please feel free to contact me at the above Cocoa location.

R. 520 (emphasis added).  The earliest records submitted to SSA from Dr. Mathur are for treatment in August 2009 (R. 491-92) despite the fact that Plaintiff testified she had received treatment for years, her statements on SSA forms that she had been treated since 2004, and Dr. Mathur's own statement that Plaintiff had been a patient "for many years."  Clearly there was an error in *collecting* the treatment records from the offices of  Drs. Mathur.  In this instance where there is a presumption that Plaintiff is disabled, and the burden of showing "medical improvement" is on the Commissioner, the collection error falls on the SSA and the ALJ.  Without documentation in the Administrative Record that treatment records for the period at issue *were* properly requested from Dr. Mathur's office, the Commissioner's credibility finding and "medical improvement" finding are not based on substantial evidence.  Accordingly, the ALJ's decision to terminate Plaintiff's benefits was not based on substantial evidence.

### B. RFC and treating physicians' opinions

Plaintiff contends the ALJ erred by failing to give the opinions of her treating physicians proper weight and by determining she had an RFC which was not supported by the relevant evidence. Plaintiff argues that if the ALJ had given Dr. Mathur's opinion more weight, the ALJ would have found that Plaintiff had not shown "medical improvement" since Dr. Mathur's RFC opinion eliminated even sedentary work.

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments. 20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436,1440 (11th Cir. 1997). The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof. *Id.* Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis*, 125 F.3d at 1440; *Edwards*, 937 F.2d at 583; 20 C.F.R. §§ 404.1527(d), 416.927(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

The ALJ held that Plaintiff had a residual functional capacity to perform light work except that she was limited to simple repetitive and routine tasks with no more than occasional changes in the work setting and occasional interactions with coworkers, supervisors, and the general public, with occasional stooping, crouching, balancing, kneeling, and overhead reaching with the right shoulder,

no concentrated exposure to pulmonary irritants and no climbing of stairs, ramps, ladders, ropes or scaffolds. R. 18.

Plaintiff contends that the ALJ erred in failing to fully credit the opinion of her treating physicians, both Drs. Mathur, who opined Plaintiff suffered from Bipolar Disorder, Anxiety/Panic Disorder, COPD, GERD, Schizophrenia, Migraine Headaches, Insomnia, Night Terrors, as well as Degenerative Disc Disease, Degenerative Joint Disease, Neuroma in the feet, Arthritis, Carpal Tunnel Syndrome, and TMJ. R. 563.   Dr. R. Mathur opined Plaintiff's ability to understand, remember, and carry out instructions was affected by her impairments; her memory loss was worse due to excess amount of stress; she was moderately limited in her ability to carry out short, simple instructions and markedly limited in carrying out detailed instructions; she would need to write down any detailed instructions and refer to her notes frequently; she was extremely limited in her ability to make judgements on simple work-related decisions; she had marked restrictions interacting appropriately with the public and with supervisors; extreme restrictions interacting with co-workers, responding appropriately to work pressures in a usual work setting, and responding appropriately to changes in a routine work setting.   R. 562-63.   Dr. Mathur also opined Plaintiff was not able to respond appropriately to supervision, co-workers, and work pressures in a work setting.  R. 564.

Plaintiff argues that the ALJ erred in giving the opinions of the consultative psychological examiner, Dr. Mortenson, more weight than either of the opinions of Drs. R. and U. Mathur[5].   The ALJ discounted the opinions of both Drs. Mathurs in large part because of the seven-year gap in the records:

> The claimant has submitted opinions from her primary care provider, Uma Mathur, M.D.  In July 2010, Dr. Mathur wrote that the claimant has been her patient for many years. (Ex. 25F at 48.) At the outset, this mischaracterizes the nature of the treating

---

[5]The consultative examination of Dr. Kan was physical in nature; however, he recognized Plaintiff had some level of psychological impairment and made the suggestion to place her "under observation and perform a psychiatric evaluation. R. 436.

relationship. While the claimant may have seen Dr. Mathur long ago as well as recently, the record makes plain that Dr. Mathur has been treating the claimant only since the summer of 2009 after an at least seven-year gap in treatment. . . . She wrote that the claimant has had no improvement in these conditions and that the claimant was unable to work. (Id.) Immediately, it can be seen that Dr. Mathur has uncritically accepted the claimant's account of her past medical history and lack of improvement In particular, the record contains nothing to substantiate the claimant's allegation of "chronic schizophrenia" (which does not even occur in non-chronic forms) or ADHD. Nor did Dr. Mathur ever make a psychiatric referral, which one would imagine would be indicated in the face of "chronic schizophrenia," or even when the claimant presented as "anxious-appearing." (Ex. 25F at 14.) . . . Lastly, despite this litany of unimproved severe physical and psychological conditions, Dr. Mathur's treatment was reserved to monthly medication refills. As noted, it is apparent that this opinion is not based on medical findings (and indeed, none are cited) and is merely a restatement of the claimant's own subjective complaints. It is given no weight.

In addition, Ramesh Mathur, M.D., (the husband of Uma Mathur, the couple share a medical practice) also completed opined that the claimant is able to lift less than ten pounds on even an occasional basis. (Ex. 29F.) The claimant is limited to no more than two hours of sitting, standing, or walking in an eight-hour workday; the claimant can sit for no more than ten minutes before needing to change position (a limitation easily exceeded at the hearing) and can stand for no more than twenty minutes before needing to change position. (Id.) The claimant will need to lie down often and at predictable intervals when working. (Id.) The only justification for these limitations is a remark to "refer to prior test results, MRIs, [ultrasounds], x-rays, and surgical procedures." (Id.) Needless to say, as far as providing a basis for a fact-finder to understand the functional limitations suggested by medical findings, merely noting the existence of diagnostic imaging leaves much to be desired. Because this opinion merely states limitations without articulating how the medical findings support them (and simply acknowledging that diagnostic procedures have been performed is not such an articulation of support), it is entitled to no weight. Additionally, as with Dr. Uma Mathur's opinion, the actual course of treatment that was followed, monthly visits for medication refills, stands in stark contrast with the extreme limitations offered in this opinion.

R. 25-26.

In contrast, the ALJ found that the psychological consultative examination report of Dr. Mortensen was not "substandard," as Plaintiff's counsel argued at the hearing, because the report was generic and inadequately detailed on the topic of the claimant's specific limitations, but found that "Dr. Mortensen's report lays out specific facts about the claimant's performance on various elements of mental status examination." R. 22. The ALJ further found Dr. Mortensen's report, "especially in

combination with the totality of *psychological objective and opinion evidence* in the record," was sufficient on the topic of the claimant's mental health functioning" and he denied Plaintiff's request for a new psychological evaluation. R. 22.  As an initial matter, the ALJ's opinion is internally inconsistent in that he found there is "no record of any treatment of any kind" and yet he found Dr. Mortenson's report to be sufficient "especially in combination with the totality of psychological objective and opinion evidence" of which he had found there was *none*.  In addition, the Court finds that Dr. Mortensen's report was rather cursory compared to others in similar cases in which the person's disability turns exclusively on their *mental* health, and particularly so in light of the ALJ's finding that there had been no mental health treatment of Plaintiff for the previous ten years, since 2002 – virtually all of the ALJ's mental health determination turned on Dr. Mortenson's cursory report. *Compare* R. 333-35 (Dr. MacKay-November 2001) *with* R. 440 (Dr. Mortenson).

Particularly in this case, where Plaintiff's anti-psychotic medications were provided by the primary care physician, the psychological consultative examination was all the more important.  As Plaintiff points out, her anxiety and other psychiatric impairments would often interfere with her attempts to get treatment from a mental health physician[6] because, as she testified, she did not trust herself to drive a car due to her anxiety, she could not get rides to therapy, did not own a car, and she would not get in a closed car with a stranger or ride the bus.  R. 41-42.  At the hospital, when she went for a psychological evaluation, she saw an aide that tried to violate her when she was 15 when she was put in their mental ward, so she left immediately.  R. 42-43.  She viewed receiving medications such as Clonazepam, Xanax, Seroquel as treatment.  R. 43.

The Commissioner contends that remand is not warranted even if there exist additional records predating 2009 showings Dr. Mathur's practice prescribed anti-psychotic medications because it was

---

[6]Plaintiff testified: "Every time I, I go to these other doctors [other than Dr. Mathur that the ALJ mentioned] I'm still very anxious and they know that. So, I don't sit in the waiting rooms, and if they do make me sit in there, and they forget about me, I go to the bathroom, I leave, I do whatever I can – it's hard to be around people." R. 43.

not treatment from a mental health specialist and would not affect the ALJ's credibility finding. Plaintiff argues that in determining her credibility the ALJ did not follow the requirements of SSR 96-7p, which states that the ALJ must carefully consider Plaintiff's explanations for failure to pursue medical treatment, such as daily activities which "may be structured so as to minimize symptoms to a tolerable level or eliminate them entirely, avoiding physical or mental stressors that would exacerbate the symptoms. . . living with the symptoms, seeing a medical source only as needed for periodic evaluation and renewal of medications. . . [and] the individual may be unable to afford treatment and may not have access to free or low-cost medical services."  While it was clearly not ideal for Plaintiff's primary care physicians to be the ones prescribing anti-psychotic drugs to Plaintiff, with Plaintiff's limited resources and Plaintiff's anxiety, agoraphobia and other psychological problems, it does not necessarily undercut her credibility that she chose to see the primary care physicians for medication renewals.  As explained above, it was error for the ALJ not to conscientiously obtain the full treatment records from Drs. Mathurs' treatment of Plaintiff.  On remand, in addition to obtaining the records from Drs. Mathur, the ALJ will order a detailed consultative examination with particular attention paid by the consultant as to whether Plaintiff suffers from the mental health impairments as opined by Drs. R. and U. Mathur: bipolar disorder, anxiety/panic disorder, schizophrenia, migraine headaches, insomnia, and night terrors.

## IV.   CONCLUSION

Accordingly, the Commissioner's decision is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g).  The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on February 24, 2015.

_David A. Baker_

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record